# EXHIBIT A



800 Third Ave., Suite 2401
New York, NY 10022
**o.** 212.577.0040  **f.** 212.577.0054

www.motleyrice.com

"I will stand for my client's rights.
I am a trial lawyer."
–Ron Motley (1944–2013)

**F. Franklin Amanat**
*Licensed in NY, NJ, DC, CT*
direct:  212.577.0052
famanat@motleyrice.com

January 16, 2026

**BY EMAIL**

Robert W. Schumacher
United States Attorney's Office
Eastern District of New York
610 Federal Plaza, 5th Floor
Central Islip, NY 11722
(631) 715-7871
Robert.schumacher@usdoj.gov

> *Re*:  *Cortez v. United States*, No. 2:24-CV-7532 (JMA/ARL)

Dear Bob:

On January 7, 2026, the Court ordered the plaintiffs to provide inquiries to ICE regarding the steps it has undertaken to refund bond obligors who were entitled to repayment but had not been paid. ECF 45. The plaintiffs provide the following questions pursuant to the Court's order and in anticipation of ICE providing evidence documenting its efforts, as further required by the Court.

The questions below cover the core issues relating to ICE's claim that it has refunded outstanding bonds: (1) the completeness of ICE's efforts to cancel bonds that it had previously failed to cancel; (2) whether ICE has sought to address other legal violations identified in the complaint as to bonds that were cancelled yet not refunded; and, if so, (3) the completeness of ICE's efforts to remedy those violations.

We note that these questions significantly overlap with questions about ICE's efforts that we already provided to ICE over 6 months ago, and which ICE has so far failed to address, despite relying on those efforts to repeatedly argue that this case is moot. These questions also significantly overlap with issues we have twice raised at conferences before the Court. We therefore hope that ICE will provide fulsome



answers to the following questions that could reduce the need for discovery practice on this issue.

## I.     Failure to cancel bonds

1.  How did ICE define "Backlog Cases"?

2.  You represented that to identify the Backlog Cases, ICE ran various key-word searches in its removal database. Please provide us further details on how those cases were identified and tallied, including (a) which databases were searched, (b) the key-word searches used, and (d) the date range(s) the searches covered.

3.  Please provide any policy statement or other written documentation detailing the individualized review process for the Backlog Cases.

4.  For the 21,000 or so Backlog Cases ICE identified, in what percentage of the cases were the bonds canceled?

5.  As to the Backlog Cases in which bonds were canceled, in what percentage of the cases were the bonds still deemed ineligible for payment or otherwise not certified for payment?

6.  As to the Backlog Cases in which bonds were canceled and certified for payment:

    a.  How many checks were sent?
    b.  How many checks were returned as undeliverable?
    c.  How many checks were deposited or cashed?
    d.  To ICE's knowledge, how many obligors did not receive the refunded bond for any reason?

7.  In the review of the Backlog Cases—and more generally—are there any situations where an individual's removal proceedings terminate, but ICE does not automatically cancel the bond, including but not limited to grants of asylum?



8. Of the Backlog Cases reviewed, what percentage were determined to be ineligible for cancellation?

   a. What is the numerical breakdown of the bases for those determinations?

9. For the Backlog cases, please provide a numerical breakdown showing how many bonds had each of these categories of cancellation events, from ICE Form I-352:
   a. "ICE taking the [noncitizen] back into its custody;"
   b. "deportation/exclusion/removal of the bonded [noncitizen];"
   c. "grant of permanent residence to the bonded [noncitizen];"
   d. "termination of deportation/removal proceedings (but not administrative closure or stay of such proceedings);"
   e. "death of the bonded [noncitizen];"
   f. "voluntary departure by the bonded [noncitizen] pursuant to a grant of voluntary departure by the immigration court or [BIA];" or
   g. "other circumstances as provided by statute or regulation."

10. For the 100,000 cash bonds that you indicated were refunded between 2020 and 2024, please provide a numerical breakdown showing how many bonds were reimbursed following each of these categories of cancellation events, enumerated in ICE Form I-352:
    a. "ICE taking the [noncitizen] back into its custody;"
    b. "deportation/exclusion/removal of the bonded [noncitizen];"
    c. "grant of permanent residence to the bonded [noncitizen];"
    d. "termination of deportation/removal proceedings (but not administrative closure or stay of such proceedings);"
    e. "death of the bonded [noncitizen];"
    f. "voluntary departure by the bonded [noncitizen] pursuant to a grant of voluntary departure by the immigration court or [BIA];" or
    g. "other circumstances as provided by statute or regulation."

11. You represented that following the initiation of this suit, there have been changes to ICE policy and practice with respect to canceling and refunding immigration bonds, including revamped procedures, additional hiring and training, and other resources specifically designed to allow ICE to more systematically and



proactively identify cancellation events. Please provide any policy statement, directive, memorandum, or other written documentation detailing these changes.

## II.     Failure to refund canceled bonds

12. How many bonds (representing how much money) have been cancelled but remain unpaid (disaggregated by year of cancellation and by funds held by ICE and funds that have been moved to Treasury)?

13. DHS has hundreds of millions of dollars in an unclaimed moneys account at Treasury, referenced in the Complaint. This account includes a significant amount of money from unrefunded immigration bonds. You have represented that this account includes a variety of different kinds of funds and is not limited to immigration bonds. What is the breakdown of the different sources of funds in this account, including the percentage that come from canceled but unpaid immigration bonds?

### A.  *Unnecessary paperwork requirement*

14. Has ICE taken any steps to refund obligors whose bonds were not refunded because the obligor failed to submit the original I-305 bond receipt form, or a notarized Affidavit in Lieu of Lost Receipt, Form I-395?

15. If so, please describe those steps and provide any policy document, memorandum, or other document detailing ICE's process or procedures for refunding those bonds.

16. In November 2019, the Office of Principal Legal Advisor issued a memorandum stating that paper copies of the I-305 bond receipt were not required to receive a refund. Subsequently, ICE identified 6,340 canceled bonds that needed to be refunded in the OCAN Methodology Memo (FOIA 2022-ICLI-00040 1849-51). How many of the 6,340 backlog bonds (representing how much money) identified have been certified for payment and refunded?


17. How many bonds (representing how much money) were moved to Treasury because the obligor failed to submit the original I-305 bond receipt form, or a notarized Affidavit in Lieu of Lost Receipt, Form I-395?

18. How many of these bonds that were moved to Treasury (representing how much money) have been paid since OPLA issued a memorandum on November 15, 2019 dispensing with the requirement to submit such paperwork?

19. What was ICE's process for determining where to send and sending the refund for such bonds, including steps ICE took to determine whether the obligor had changed addresses?

20. As to all the bonds discussed in this subsection—bonds that were cancelled but initially not refunded because the obligor failed to submit the original I-305 bond receipt form, or a notarized Affidavit in Lieu of Lost Receipt, Form I-395— please provide:

    a. The number of bonds that were certified for payment;
    b. The number of checks that went out;
    c. The number of checks that were returned as undeliverable;
    d. If checks were returned as undeliverable, any steps that ICE then took to ensure refunds;
    e. The number of checks that were deposited or cashed; and
    f. To ICE's knowledge, how many obligors did not receive the refunded bond for any reason?

### B. *Insufficient notice*

21. What means has ICE employed to provide notices of cancelation to obligors?

22. What means has ICE employed to provide refunds to obligors?

23. Please provided all policy statements, directives, memorandums, or other written documentations that details the process by which ICE now, and in the past, has updated its records when it learns that an obligor's address has changed.



24. What additional steps, if any, is ICE taking to effectuate payment to an obligor if a bond payment is returned as undeliverable?

We appreciate your assistance and look forward to receiving your responses. Please let us know if you have any questions or would like to discuss.

Sincerely,

F. Franklin Amanat
Motley Rice LLC
*Counsel for Plaintiff*

cc (via email):
        All counsel of record